# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

DENISE GILMAN,

                Plaintiff,

                v.

U.S. DEPARTMENT OF HOMELAND
SECURITY, *et al*.,

                Defendants.

Civil Action No. 09-0468 (BAH)
Judge Beryl A. Howell

## MEMORANDUM OPINION

The plaintiff, Denise Gilman, brings this case under the Freedom of Information Act ("FOIA"), 5 U.S.C. § 552, seeking release of certain U.S. Customs and Border Protection ("CBP") records concerning the construction of a fence on the Texas-Mexico border.  Pending before the Court are the parties' cross-motions for summary judgment regarding CBP's production of email records in response to the plaintiff's FOIA request, which response withheld landowner names and addresses, under FOIA Exemption 6, and information related to CBP's assessments of the need for fencing, under FOIA Exemption 7(E), and excluded email attachments from the records produced to the plaintiff.[1]  For the reasons explained below, CBP's motion is granted in part, with respect to portions of records withheld pursuant to FOIA Exemption 7(E) and the exclusion of email attachments from production to the plaintiff, and denied in part, as to its redaction of landowner names and addresses pursuant to FOIA

---

[1] The plaintiff has also named as defendants the Army Corps of Engineers ("ACE") and the Department of Homeland Security ("DHS"), but has settled her claims with defendant ACE, which was dismissed as a party.  *See* Stip. Settlement Order Dismissal of ACE, ECF No. 24; *see also* Def.'s Mem. Supp. Def. CBP's Mot. Summ. J. Email Recs. ("Def.'s Mem.") at 3.  Although both DHS and CBP remain parties to the action, after DHS referred the request to CBP, *see* July 23, 2009, Joint Status Report ("7/23/09 JSR") at 3, the parties agree that DHS is only "nominally a defendant . . . [but] has no further involvement in this action."  Def.'s Mem. at 3; Pl.'s Mem. Opp'n Def.'s Mot. Summ. J. Email Recs. Supp. Pl.'s Mot. ("Pl.'s Mem.") at 4, ECF No. 35.  Consequently, "only CBP records remain at issue."  Pl.'s Mem.

Exemption 6, and the plaintiff's motion is granted in part with respect to the redaction of landowner names and addresses under FOIA Exemption 6 and is otherwise denied.[2]

## I.    BACKGROUND

### A.    The Texas-Mexico Border Fence

In 2006, Congress passed the Secure Fence Act, ordering "construction of a fence or wall along specific portions of the U.S.-Mexico border, including areas in Texas." *See* Complaint ("Compl.") ¶ 5, ECF No. 1 (citing Secure Fence Act, Pub. L. No. 109-367, § 3, 120 Stat. 2638 (2006)). The Act was later amended to mandate "reinforced fencing along not less than 700 miles of the southwest border" and charged the Secretary of Homeland Security with completing 370 miles of the reinforced fencing by the end of 2008. Consolidated Appropriations Act, FY 2008, Pub. L. No. 110-161, § 564, 121 Stat. 1844, 2090–91 (2007). The precise location of the fence, however, was left to the U.S. Department of Homeland Security ("DHS") to determine "where fencing would be most practical and effective," provided that DHS consult with, *inter alia*, "states, local governments, Indian tribes, and property owners . . . to minimize the impact" on those living near the site of the future fence. *Id.*

### B.    FOIA Requests

The plaintiff is a clinical professor at the University of Texas School of Law. Decl. Denise Gilman ("Gilman Decl.") ¶ 1, ECF No. 35-1. In late 2007, the plaintiff spearheaded a working group that focused on the human rights impact of the border fence by "conduct[ing] research and analysis of the legal, historical, property, environmental, indigenous, community, and other impacts of the border wall." *Id.* ¶ 4–5. As part of that effort, the plaintiff submitted several FOIA requests to the CBP, DHS, and the U.S. Army Corps of Engineers ("ACE"). *See*

---

[2] As of November 12, 2013, defendant CBP had completed production of all email and non-email records that it believed were responsive to the plaintiff's request, and no challenge has been raised to the agency's search. *See* Nov. 12, 2013 Joint Status Report at 1–2, ECF No. 48; Def.'s Mem. at 1.

Def.'s Mem. Supp. Def. CBP's Mot. Summ. J. Email Recs. ("Def.'s Mem.") at 3, ECF No. 32.

The plaintiff's request to CBP asked for: (1) "Maps of possible locations for segments of fence or wall along the Texas/Mexico border;" (2) "files including geographic coordinates . . . for surveyed points along potential routes for segments of fence or wall along the Texas/Mexico border;" (3) "Documents identifying the properties possibly affected by the construction of the border fence or wall along the Texas/Mexico border, including documents that provide information regarding the ownership of the possibly affected properties and any other information about the characteristics of those properties;" (4) "Documents identifying the properties for which the United States government has sought to obtain access through consent/waiver or through litigation;" (5) "Documents reflecting appraisals of properties possibly affected by the construction of the border fence or wall along the Texas/Mexico border;" (6) "Documents reflecting surveys or other analyses of the areas possibly affected by the border fence or wall along the Texas/Mexico border;" (7) "Documents that describe the considerations or factors taken into account in making decisions regarding potential routes for segments of fence or wall along the Texas/Mexico border;" (8) "Communications received from, provided to or referenced by the Department of Homeland Security that make recommendations or suggestions regarding the route for segments of fence or wall along the . . . Texas/Mexico Border;" and (9) "Documents relating to potential or actual contracts for the execution of land surveys or construction of segments of fence or wall along the Texas/Mexico border."  Gilman Decl. Ex. 2 at 18–19 (Plaintiff's FOIA request to CBP dated April 11, 2008).  Near-identical requests were also sent to DHS and ACE.  *See* Compl.  ¶ 6.

DHS informed the plaintiff by letter that it referred her request to CBP "as the component of DHS likely to possess the records requested."  *See* July 23, 2009, Joint Status Report

("7/23/09 JSR") at 3, ECF No. 6. Before the plaintiff filed suit, she received from CBP two

records, from ACE, 69 pages of records, and from DHS, no records. *See* Gilman Decl. ¶ 10;

Pl.'s Mot. Summ. J. ("Pl.'s Mem.") at 4, ECF No. 35.

## C. FOIA LITIGATION

The plaintiff filed the instant action to compel the disclosure of responsive records, but

subsequently agreed with CBP to bifurcate the email production and non-email production of

records. *See* 7/23/09 JSR at 2–3; *see also* July 27, 2009 Scheduling Order ("7/27/09 Sched.

Order") ¶¶ 1–3, ECF No. 7. The parties submitted a joint status report informing the Court that

"in the interest of expediting the release of e-mails to Plaintiff," CBP could "satisfy Plaintiff's

FOIA request with respect to the processing of e-mails by providing to Plaintiff the e-mails as

released in *Crew v. DHS* pursuant to the search described in the Joint Status Report and Proposed

Disclosure Schedule . . . in that case." *See* 7/23/09 JSR at 3 (citing *Citizens for Responsibility &*

*Ethics in Wash. v. U.S. Dep't of Homeland Sec.* ("*CREW*"), No. 08-1046 (D.D.C. filed June 18,

2008)). The parties further explained that *CREW* involved a search for emails "of the 25 CBP

officials most directly involved in the border fence placement division" and was scheduled to

produce "1,000 pages of e-mails per month" until there were no remaining responsive records.

*Id.* at 2–3. This was a "broader" search for records than that which the plaintiff had requested

because the plaintiff in *CREW* sought records "for the entire Southwest border of the United

States instead of just the Texas-Mexico border." Def.'s Mem. at 4–5. CBP was already

processing email records in *CREW*, *id.* at 4, and the arrangement meant CBP "would not have to

expend its limited resources to search for, retrieve and process email records in response to

Plaintiff's FOIA request," *id.* at 5, and "allowed Plaintiff to receive email records more

expeditiously than she otherwise would," i*d.* at 4. CBP agreed to release to the plaintiff "all e-

mails already released in *CREW v. DHS*" and to continue to provide the plaintiff with "further e-mails as they are released on a rolling basis in that case." 7/23/09 JSR at 3. The Court subsequently entered an order stating that "CBP will release to Plaintiff all email records already released in [*CREW*], and, going forward, CBP will release to Plaintiff on a rolling basis all e-mail records released in [*CREW*], on the same schedule as they are released in that case." 7/27/09 Sched. Order ¶ 2.

Two years after the plaintiff filed suit, CBP "completed or was near completion" of its production of records in both the *CREW* litigation and the instant case. Gilman Decl. ¶ 12. CBP was ordered to produce any remaining responsive email records to the plaintiff within a month, *see* March 28, 2011 Order, ECF No. 27, and the plaintiff was ordered to raise any disputes with the claimed exemptions within 60 days. *Id.*; *see also* June 27, 2011 Joint Status Report ("6/27/2011 JSR"), ECF No. 28. In total, CBP "made 15 productions of email records . . . representing all emails produced in the *CREW v. DHS* case." *Id.* at 2 n.1. The plaintiff "identified for CBP the 289 emails with redactions and/or withholdings she is challenging," Pl.'s Mot. Summ. J. ("Pl.'s Mem.") at 5, and CBP agreed to conduct a further review of the challenged records, 6/27/11 JSR at 3. The parties were aware when the 6/27/11 JSR was filed that the plaintiff challenged "the fact that attachments were not part of the email production." *Id*. CBP explained that it would satisfy its obligation to the plaintiff by releasing to her emails which were identical to those released in *CREW*, "and, therefore, to the extent attachments were not included in the email release made in *CREW v. DHS*, they were not provided to Plaintiff." *Id.* This was contrary to the plaintiff's understanding that, to the extent the CBP withheld portions of emails, the plaintiff would still be able to challenge those redactions. *Id.* In the plaintiff's view,

CBP's non-production of attachments to responsive emails was a withholding without any applicable exemption that must therefore be disclosed. *Id.*

The plaintiff has substantially narrowed her challenges to CBP's production of responsive records. *See* Pl.'s Reply Def.'s Opp. Pl.'s Mot. Summ. J. Re. Email Discl. ("Pl.'s Reply") at 1, ECF No. 42. The plaintiff has expressly stated that she no longer challenges (1) "CBP's redaction of emails under Exemption 5," Pl.'s Reply at 1; (2) the "Exemption 7(E) redactions on" Record 24 listed in the *Vaughn* index, *id.*; (3) the "withholding of the phone numbers or email addresses of landowners" or the withholding of names and contact information of "CBP employees or of individual employees of contractors," Pl.'s Mem. at 5; and (4) the withholding of email attachments beyond those attached to the "289 emails at issue in these cross-motions," *id.* at 25. Due to the plaintiff's decision not to challenge these withholdings, summary judgment is granted to CBP as to those issues. The reasons for the plaintiff's remaining challenges are discussed below.

## II.     LEGAL STANDARD

Congress enacted the FOIA to promote transparency across the government. *See* 5 U.S.C. § 552; *Stern v. FBI*, 737 F.2d 84, 88 (D.C. Cir. 1984). The Supreme Court has explained that the FOIA is "a means for citizens to know 'what their Government is up to.' This phrase should not be dismissed as a convenient formalism. It defines a structural necessity in a real democracy." *Nat'l Archives & Records Admin. v. Favish,* 541 U.S. 157, 171–72 (2004) (citation and internal quotation marks omitted). "The basic purpose of FOIA is to ensure an informed citizenry, vital to the functioning of a democratic society, needed to check against corruption and to hold the governors accountable to the governed." *NLRB v. Robbins Tire & Rubber Co.*, 437 U.S. 214, 242 (1978); *see also SEC v. Am. Int'l Grp.*, 712 F.3d 1, 3 (D.C. Cir. 2013) ("The

public has a fundamental interest in 'keeping a watchful eye on the workings of public agencies.'" (quoting *Wash. Legal Found. v. U.S. Sentencing Comm'n*, 89 F.3d 897, 905 (D.C. Cir.1996))). As a result, the FOIA requires federal agencies to release all nonexempt records responsive to a request. *See* 5 U.S.C. § 552(a)(3)(A).

To protect "legitimate governmental and private interests [that] could be harmed by release of certain types of information," *United Techs. Corp. v. U.S. Dep't of Def.,* 601 F.3d 557, 559 (D.C. Cir. 2010) (internal quotation marks omitted), Congress included nine exemptions permitting agencies to withhold information from FOIA disclosure. *See* 5 U.S.C. § 552(b). "These exemptions are explicitly made exclusive, and must be narrowly construed." *Milner v. U.S. Dep't of the Navy*, 131 S.Ct. 1259, 1262 (2011) (citations and internal quotation marks omitted); *see also Pub. Citizen, Inc. v. Office of Mgmt. & Budget*, 598 F.3d 865, 869 (D.C. Cir. 2010) ("FOIA allows agencies to withhold only those documents that fall under one of nine specific exemptions, which are construed narrowly in keeping with FOIA's presumption in favor of disclosure.") (citations omitted). Upon exhaustion of administrative remedies, a FOIA requester may file a civil action challenging an agency's response to its request. *See* 5 U.S.C. § 552(a)(4)(B); *Wilbur v. CIA*, 355 F.3d 675, 677 (D.C. Cir. 2004). Once such an action is filed, the agency generally has the burden of demonstrating that its response to the plaintiff's FOIA request was appropriate. *See id.* at 678. Federal courts are authorized under the FOIA "to enjoin the agency from withholding agency records and to order the production of any agency records improperly withheld from the complainant." *Id.* § 552(a)(4)(B).

It is typically appropriate to resolve FOIA cases on summary judgment. *See Brayton v. Office of the U.S. Trade Rep.*, 641 F.3d 521, 527 (D.C. Cir. 2011) ("the vast majority of FOIA cases can be resolved on summary judgment"). When an agency's response to a FOIA request is

to withhold responsive records, either in whole or in part, the agency "bears the burden of proving the applicability of claimed exemptions." *Am. Civil Liberties Union v. U.S. Dep't of Def.* ("*ACLU/DOD* "), 628 F.3d 612, 619 (D.C. Cir. 2011). The agency may sustain its burden of establishing that requested records were appropriately withheld through the submission of declarations detailing the reason that a FOIA exemption applies, along with an index, as necessary, describing the materials withheld. *See, e.g.*, *id.* at 619; *Students Against Genocide v. U.S. Dep't of State*, 257 F.3d 828, 840 (D.C. Cir. 2001); *Vaughn v. Rosen*, 484 F.2d 820, 827–28 (D.C. Cir. 1973). "If an agency's affidavit describes the justifications for withholding the information with specific detail, demonstrates that the information withheld logically falls within the claimed exemption, and is not contradicted by contrary evidence in the record or by evidence of the agency's bad faith, then summary judgment is warranted on the basis of the affidavit alone." *ACLU/DOD*, 628 F.3d at 619. As the D.C. Circuit recently explained, in FOIA cases "'[s]ummary judgment may be granted on the basis of agency affidavits if they contain reasonable specificity of detail rather than merely conclusory statements, and if they are not called into question by contradictory evidence in the record or by evidence of agency bad faith.'" *Judicial Watch, Inc. v. U.S. Secret Serv.*, 726 F.3d 208, 215 (D.C. Cir. 2013) (quoting *Consumer Fed'n of Am. v. U.S. Dep't of Agric.*, 455 F.3d 283, 287 (D.C. Cir. 2006) and *Gallant v. NLRB*, 26 F.3d 168, 171 (D.C. Cir. 1994)). While the burden remains on the moving party to demonstrate that there is an "absence of a genuine issue of material fact" in dispute, *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986), in FOIA cases, "an agency's justification for invoking a FOIA exemption is sufficient if it appears 'logical' or 'plausible.'" *ACLU/DOD*, 628 F.3d at 619 (quoting *Larson v. U.S. Dep't of State*, 565 F.3d 857, 862 (D.C. Cir. 2009)).

## III. DISCUSSION

The plaintiff contends that CBP: (1) improperly redacted "the names and addresses of landowners who would potentially be affected by the border wall," under FOIA Exemption 6; (2) improperly redacted "records containing an assessment of the need for fencing in certain areas," under FOIA Exemption 7(E); and (3) improperly withheld email attachments pursuant to no specific FOIA exemption. Pl.'s Reply at 1. The plaintiff's challenges are addressed *seriatim* below.

### A. FOIA Exemption 6

The plaintiff challenges CBP's withholding, under Exemption 6, of the names and addresses of private citizen landowners that are referenced in emails to and from CBP employees.[3] Exemption 6 protects "personnel and medical files and similar files the disclosure of which would constitute a clearly unwarranted invasion of personal privacy." 5 U.S.C. § 552(b)(6). "The information in the file 'need not be intimate' for the file to satisfy the standard, and the threshold for determining whether information applies to a particular individual is minimal." *Milton v. U.S. Dep't of Justice,* 783 F. Supp. 2d 55, 58 (D.D.C. 2011) (quoting *N.Y. Times Co. v. Nat'l Aeronautics & Space Admin*., 920 F.2d 1002, 1006 (D.C. Cir. 1990) (en banc)). Once this threshold determination is met, the Court next inquires whether disclosure "would compromise a substantial, as opposed to *de minimis*, privacy interest," because FOIA demands disclosure "[i]f no significant privacy interest is implicated." *See Multi Ag Media LLC v. U.S. Dep't of Agric.*, 515 F.3d 1224, 1229 (D.C. Cir. 2008) (citing *Nat'l Ass'n of Retired Fed. Emps. v. Horner* ("*Horner*")*,* 879 F.2d 873, 874 (D.C. Cir. 1989), *cert. denied,* 494 U.S. 1078 (1990)). The standard "means less than it might seem," as a substantial privacy interest is

---

[3] At issue is the withholding of names and addresses of private citizen landowners, not commercial landowners, individuals who were points of contact for commercial entities, or employees of the CBP. *See* Supplemental Decl. of David E. Wade ("Suppl. Wade Decl.") ¶ 15 & n.1.

"anything greater than a *de minimis* privacy interest." *Id.* at 1229–30. If there is a substantial

privacy interest in the information, the Court employs a balancing test to determine whether

release of such information constitutes a clearly unwarranted invasion of personal privacy,

*Wash. Post Co. v. U.S. Dep't of Health & Human Servs.*, 690 F.2d 252, 260 (D.C. Cir. 1982);

*U.S. Dep't of the Air Force v. Rose*, 425 U.S. 352, 372 (1976); *see also U.S. Dep't of Justice v.*

*Reporters Comm. for Freedom of the Press*, 489 U.S. 749, 756 (1989), by weighing "the privacy

interest that would be compromised by disclosure against any public interest in the requested

information." *Multi Ag Media LLC*, 515 F.3d at 1228. "Exemption 6's requirement that

disclosure be 'clearly unwarranted' instructs us to 'tilt the balance (of disclosure interests against

privacy interest) in favor of disclosure.'" *Morley*, 508 F.3d 1108, 1127 (D.C. Cir. 2007) (quoting

*Wash. Post Co. v. U.S. Dep't of Health & Human Servs*., 690 F.2d at 261).

As a threshold matter, the Court must determine whether the withheld information

constitutes "similar files" to "personnel and medical files" that are subject to exemption 6. 5

U.S.C. § 552(b)(6). "The terms [sic] 'similar files' is construed broadly and 'is intended to cover

detailed Government records on an individual which can be identified as applying to that

individual.'" *Gov't Accountability Project*, 699 F. Supp. 2d at 105–06 (quoting *U.S. Dep't of*

*State v. Wash. Post Co.,* 456 U.S. 595, 602 (1982)). Courts look to the "nature of the

information at issue," not necessarily "the nature of the files." *See Skybridge Spectrum Found. v.*

*FCC*, 842 F. Supp. 2d 65, 83 (D.D.C. 2012) (quoting *N.Y. Times Co. v. Nat'l Aeronautics &*

*Space Admin.,* 920 F.2d at 1006 (quotation marks omitted)); *see also Judicial Watch, Inc. v.*

*FDA*, 449 F.3d 141, 152–53 (D.C. Cir. 2006) ("similar files" encompasses "not just files, but

also bits of personal information, such as names and addresses, the release of which would

'create[] a palpable threat to privacy.'") (quoting *Carter v. U.S. Dep't of Commerce*, 830 F.2d

388, 391 (D.C. Cir. 1987)). The plaintiff does not dispute that the requested information is a "similar file," *see* Pl.'s Mem. at 7–12, and because the names and addresses of landowners are "bits of personal information," *Judicial Watch*, 449 F.3d at 152, that "applies to [] particular individual[s]," *see Wash. Post Co.*, 690 F.2d at 260, Exemption 6 may be triggered. The Court must next examine whether the requested information implicates a substantial privacy interest and, if so, whether release of the information would be "clearly unwarranted" in view of the public interest, if any, in the requested documents.

1. *A Substantial Privacy Interest Exists In The Withheld Name And Address Information*

In construing Exemption 6, the D.C. Circuit has held that "the disclosure of names and addresses is not inherently and always a significant threat to the privacy of those listed; whether it is a significant or a *de minimis* threat depends upon the characteristic(s) revealed by virtue of being on the particular list, and the consequences likely to ensue." *Horner*, 879 F.2d at 877; *see also United States Dep't of State v. Ray*, 502 U.S. 164, 176 n.12 (1991) (noting that disclosure of a list of names and other identifying information is not "inherently and always a significant threat to the privacy of the individuals on the list."). "In the context of an individual residence, the court has recognized that 'the privacy interest of an individual in avoiding the unlimited disclosure of his or her name and address is significant.'" *Nat'l Ass'n of Home Builders v. Norton* ("*Norton*"), 309 F.3d 26, 35 (D.C. Cir. 2002) (quoting *Horner*, 879 F.2d at 875); *see also Skybridge Spectrum Found.*, 842 F. Supp. 2d at 84 (same). CBP supports its position that there are substantial privacy interests in the names and addresses of private citizens referenced in the 289 challenged emails for three reasons.

First, CBP asserts that there is a "potential [for] unwanted contact that might ensue from such a disclosure," and this risk creates a heightened privacy interest. Def.'s Combined Reply

Supp. Mot. Summ. J. Re Email Records & Opp'n Pl.'s Cross-Mot. Summ. J. ("Def.'s Reply") at 3, 7, ECF No. 40. According to the CBP, the unwanted contact to which the landowners could be exposed may come from "the media, other members of the public, including other landowners involved in a similar process, and potential harassment." Supplemental Decl. of David E. Wade ("Suppl. Wade Decl.") ¶ 15; *see also* Def.'s Reply at 3 (explaining that disclosure would risk exposing landowners to unwanted media attention because the border fence "touched a nerve among many groups."). CBP is correct that "a justified and articulable risk of media harassment" implicates a substantial privacy interest. *Judicial Watch, Inc. v. U.S. Dep't of State*, 875 F. Supp. 2d 37, 47 (D.D.C. 2012) (citing *Elec. Privacy Info. Ctr. v. U.S. Dep't of Homeland Sec.*, 384 F. Supp. 2d 100, 118 (D.D.C. 2005) (withholding of employee names upheld where media scrutiny and harassment were likely)). Given that the plaintiff herself admits that the construction of the wall received "significant public interest and attention," and "extensive coverage . . . in the national, international and state and local press," *see* Gilman Decl. ¶ 6 (citing articles), there is sufficient evidence to support CBP's claim that disclosure may expose the landowners to unwanted contact from the media. *See Judicial Watch, Inc.*, 875 F. Supp. 2d at 47 (court found government employees had a substantial privacy interest in withholding names from emails discussing a meeting on the Keystone Alaska pipeline because it could lead to "possible harassment and undesired contact by media.").

Second, CBP argues that disclosure implicates a substantial privacy interest because the email threads discussing the landowners also discuss details of "specific negotiations between landowners and the government, sometimes including a discussion of the particular terms a landowner was willing to accept to permit access or purchase," Suppl. Wade Decl. ¶ 15, or whether "land was subject to pending condemnations for right of entry." Def.'s Reply at 4, 8.

CBP contends that disclosure of the names would, in many instances, provide information about the landowners' discussions with the CBP about their valuation of the use or sale of their land. Def.'s Reply at 3; *see, e.g.*, Suppl. Wade Decl. Ex. 1 at 18 (email dated November 26, 2007, recounting one landowner's extended negotiations with CBP officials seeking $10,000 and a fence structure agreement); Suppl. Wade Decl. at 22 (email dated November 21, 2007, stating that a landowner "is agreeable to allowing us to complete our survey . . . [and] is very pleased with the progress thus far and looks forward to working together, but he does have some requests (fence type)"); *id.* at 16 (email dated December 6, 2007, commenting that "[name redacted] is not going to relent . . . [and] is absolutely sure that he has the upper hand" and wants "money and a fence structure agreement from" CBP). This information, if disclosed, would "allow for an inference to be drawn about the financial situation of an individual," *see Multi Ag Media LLC*, 515 F.3d at 1230, which creates an amplified privacy interest in the names and addresses. *See Horner*, 879 F.2d at 876–77; *Consumers' Checkbook Ctr. for the Study of Servs. v. U.S. Dep't of Health & Human Servs.*, 554 F.3d 1046, 1050 (D.C. Cir. 2009) (recognizing that the D.C. Circuit has "consistently held that an individual has a substantial privacy interest under FOIA in his financial information, including income"); *Jurewicz v. U.S. Dep't of Agric.*, 741 F.3d 1326, 1332 (D.C. Cir. 2014) (affirming district court's finding that there is a "non-negligible, limited privacy interest" in information related to dog breeders' gross sales under Exemption 6 privacy interest analysis); *Multi Ag Media LLC*, 515 F.3d at 1230 (finding a substantial privacy interest in disclosure of a farm's reported acreage and the "number and width of rows of tobacco" because it "'may provide a snapshot' of a farm's financial circumstances and 'shed[] light on the financial condition of the farmer'") (citation omitted).

Third, CBP contends that the names implicate a substantial privacy interest because the names are referenced as part of discussions between CBP employees that reveal the landowners' personal relationships and "specific statements" that the landowners have made regarding their views about the border fence. *See* Suppl. Wade Decl. ¶ 15; Def.'s Mem. at 8; *see, e.g.*, Supplemental Gilman Decl. ("Suppl. Gilman Decl.") Ex. E at 16 (email dated February 25, 2008, stated that "[redacted name] admitted that he could not see the controversy after looking into the maps available on the internet"); Gilman Decl. Ex. 4 at 30 (email dated April 30, 2007, that references area along the proposed fence "belong[ing] to one owner [name redacted] who is a friend of the President and a staunch supporter of the Border Patrol . . . [but] is adamantly opposed to the fence concept").

The plaintiff responds that there is no substantial privacy interest because "the main information that would be revealed" would be "that the named people owned land that was potentially going to be affected by the building of the border wall." Pl.'s Mem. at 8; *see, e.g.*, Suppl. Wade Decl. Ex. 1 at 17 (email dated November 26, 2007, in which CBP employee asks, "[w]ill [name redacted] sell the property needed for the fence alignment as well as the ROE for survey?"). She contends that other emails with redactions only reference names with respect to information that is already publicly disclosed. Pl.'s Mem. at 8; *see, e.g.*, Suppl. Gilman Decl. Ex. B at 8 (email dated February 4, 2008, referencing a news article that is attached in the email about a lawsuit filed by "the Mennonite Brethren Church and private landowner [name redacted]"). Other emails mention names as a shorthand way to identify property. Pl.'s Mem. at 8 (citing Gilman Decl. Ex. 5 at 34 (email dated February 26, 2008, stating that "[w]e actually just drove by [name redacted] house on segment O-15"); *id.* Ex. 6 at 37 (email dated February 1, 2008, stating that CBP was granted possession to investigate a list of properties that are all

identified by redacted names)); *see also* Suppl. Gilman Decl. Ex. E at 19 (email dated February 22, 2008, referring to "property owned by the [name redacted]").

The Court agrees with the CBP. Contrary to the plaintiff's claims, the information at issue here comprises more than just publicly available names and addresses. Notably, even if these names and addresses were publicly available, a finding of a substantial privacy interest would not be precluded. *See Am. Civil Liberties Union v. U.S. Dep't of Justice* ("*ACLU*"), 655 F.3d 1, 12 (D.C. Cir. 2011) (finding a minimal but "more than a de minimis" privacy interest in docket numbers and names of defendants when information was "already publicly available and readily accessible" and disclosure would "simply provide one more place in which a computerized search will find the same person's name and conviction"). In any event, the context in which these names appear in the CBP emails is not publicly accessible information, which creates a heightened privacy interest. Indeed, some of the names and addresses are part of discussions revealing, at least to a limited extent, the property owner's financial information, opinions, or the substance of their conversations with the CBP. *See* Suppl. Wade Decl. Ex. 1; *see also* Def.'s Mem. at 4, 8. *Cf. Columbia Riverkeeper v. Fed. Energy Regulatory Comm'n*, 650 F. Supp. 2d 1121, 1129 (D. Or. 2009) (finding that agency failed to establish sufficient privacy interest in mailing list of landowners on the path of proposed pipeline in part because "the names and addresses themselves [did not] reveal private decisions of those individuals" and agency had released names on similar lists in the past). In this case, because CBP has demonstrated that disclosure would create "a justified and articulable risk of media harassment" for all the landowners, *Judicial Watch, Inc.*, 875 F. Supp. 2d at 47, and that disclosure would reveal financial information, or opinions and views of some landowners, there is a more than *de minimis* privacy interest. As noted, the standard for demonstrating a substantial privacy interest

is not a high one, *see Horner*, 879 F.2d at 874 (substantial privacy interest is anything greater than *de minimis*), and CBP has demonstrated that the privacy interest is more than *de minimis*.

## 2. *The Public Interest Outweighs The Private Interest*

"The public interest to be weighed against the privacy interest in this balancing test is 'the extent to which disclosure would serve the 'core purposes of the FOIA''' by "'contribut[ing] significantly to public understanding of the operations or activities of the government.'" *Norton*, 309 F.3d at 33–34 (citing *U.S. Dep't of Def. v. Fed. Labor Relations Authority* ("*Dep't of Def.*")*,* 510 U.S. 487, 495 (1994)). In making the requisite balancing analysis here, the Court finds that CBP has failed to demonstrate that the public interest outweighs the landowners' privacy interest.

The plaintiff claims that the public interest is "significant" because it will "help the public understand the actual dimensions and location of the wall" as well as "allow the public to analyze whether the government was treating property owners equally and fairly" or whether CBP built the wall in such a way that it disadvantaged "minority property owners." Pl.'s Mem. at 10–11; *see also* Pl.'s Reply at 6 ("[T]he public has a significant interest in understanding which properties were affected by the placement of the wall, and how those property owners were affected."). CBP responds that the public interest in the disclosure of landowner names and addresses is "sharply limited," Def.'s Mem. at 15, because "the names and contact information for these individuals does not shed light on CBP's operations or activities." Def.'s Mem. at 17. CBP adds that information on the personal impact of the wall on individual landowners' families is not a matter of public concern "but a personal issue unique to the particular landowner." Def.'s Reply at 9. Notwithstanding the fact that disclosure of the names the plaintiff seeks will, at least in some instances, reveal information about the landowners' personal opinions and

negotiations with the government, the plaintiff is correct that, on balance, the public interest outweighs the landowners' privacy interest.

CBP fails adequately to consider the extent to which the release of the landowners' names in the aggregate will further public understanding. It cites several cases for support, all of which are inapposite. CBP relies on *U.S. Department of Justice v. Reporters Committee for Freedom of the Press*, 489 U.S. 749, 775 (1989), to support its contention that "[i]nformation that does not directly reveal the operation or activities of the federal government 'falls outside the ambit of the public interest that the FOIA was enacted to serve.'" Def.'s Mem. at 15–16. More precisely, the Supreme Court held that where the request sought only private information and would reveal no "official information" about a government agency, the invasion of privacy is" unwarranted. *Id.* at 780. *Reporters Comm. Freedom of the Press*, 489 U.S. at 780. Based upon this holding, CBP makes the unremarkable observation that "even a modest privacy interest outweighs nothing every time." Def.'s Mem. at 16 (citing *Horner*, 879 F.2d at 874–75). This holding does not, as CBP asserts, foreclose a request that indirectly reveals information about the operations of a government agency through the disclosure of private information. Contrary to CBP's argument, the public interest in this case is significant and does not amount to "nothing." *Id.*

The D.C. Circuit's decision in *ACLU*, 655 F.3d at 1, is particularly instructive. There, the Circuit considered the balancing of privacy and public interests under Exemption 7(C), but the ambit of Exemption 7(C) is relevant to this discussion. Exemption 7(C) is "somewhat broader" than Exemption 6, *Roth v. U.S. Dep't of Justice,* 642 F.3d 1161, 1173 (D.C. Cir. 2011) (quoting *Reporters Comm. Freedom of the Press,* 489 U.S. at 756), because, although the cognizable harm under both exemptions is an "unwarranted invasion of personal privacy," this harm must be

"clear[ ]" under Exemption 6, yet it need only be "reasonably [] expected" under Exemption 7(C). *See* 5 U.S.C. §§ 552(b)(6), 552(b)(7)(C). Consequently, "'Exemption 7(C) is more protective of privacy than Exemption 6' and thus establishes a lower bar for withholding material." *ACLU*, 655 F.3d at 6 (citations omitted). In *ACLU*, an advocacy organization sought the disclosure of docket numbers and names of defendants who had been the targets of warrantless cell phone tracking. *Id.* at 12. The Circuit found that there was "more than a de minimis privacy interest," but not "much more" because the information was already "readily available to the public," which "reduces . . . the incursion on privacy resulting from disclosure." *Id.* at 9, 12. The agency argued that despite the minimal private interest, disclosure was not required because the case names and docket numbers "standing alone generate no public benefit." *Id.* at 15. The Court disagreed, holding that the public benefit was "significant" because the requested information could be used derivatively in order to "shed light on government conduct" on "a topic of considerable public interest." *Id.* at 12. The information, when compiled, would "inform [an] ongoing public policy discussion by shedding light on the scope and effectiveness of cell phone tracking as a law enforcement tool." *Id.* at 13. Even under the more stringent 7(C) privacy protection standard, the Circuit held that this public interest outweighed the minimal privacy interest of the publicly available information, and ordered disclosure of the withheld information. *Id.* at 16.

Similarly here, although the names and addresses of the land owners implicates a stronger privacy interest than in *ACLU* because the information reveals more than just publicly available information, see Part III.A.1., *supra*, there is great public benefit to learning the social impact of CBP's construction of the wall. Revealing the identities of landowners in the wall's planned construction site may shed light on, *inter alia*, the impact on indigenous communities, the

disparate impact on lower-income minority communities, and the practices of private contractors. *See* Gilman Decl. ¶ 7. The information, after appropriate analysis, could reveal CBP's decisionmaking and conduct as it relates to the Texas-Mexico border wall planning and construction, thus it helps the public "learn something directly about the workings of the *Government.*" *Horner*, 879 F.2d at 879 (emphasis in original). Although the privacy interest in the requested information is not insubstantial, it does not outweigh the strong public interest in releasing the names and addresses.

"[W]ith regard to the applicability of Exemption 6 to names and home addresses, federal courts have differed in their conclusions when employing the private interest/public interest balancing test." *People for the Am. Way Found. v. Nat'l Park Serv.*, 503 F. Supp. 2d 284, 304–05 (D.D.C. 2007). A survey of these cases shows that, on balance, when the disclosed information would "'she[d] light on an agency's performance of its statutory duties' or otherwise let citizens know 'what their government is up to,'" *Dep't of Def.,* 510 U.S. at 497 (citations omitted), disclosure is appropriate, even if the Court has recognized a significant privacy interest. In other words, even when a significant privacy interest is at stake, Exemption 6 "require[s] a balance tilted emphatically in favor of disclosure." *Stern*, 737 F.2d at 91; *see also News-Press v. U.S. Dep't of Homeland Sec.*, 489 F.3d 1173, 1198 (11th Cir. 2007) ("The federal courts, including this one, have therefore generally concluded that an agency's burden under Exemption 6 of showing that disclosure 'would constitute a clearly unwarranted invasion of personal privacy' is an onerous one.").

In considering disclosure of names and addresses of private citizens when such information is associated with citizens' financial information, such as receipt of government benefits, or the value of property and acreage, courts have scrutinized the precise public interest

in the information.  Upon articulation by a requester of a legitimate public interest in disclosure

of names and addresses, courts have required disclosure.  *See Multi Ag Media LLC*, 515 F.3d at

1232–33 (holding that Farm Service Agency's database revealing field acreage and ownership of

land was not properly withheld, even though there was a privacy interest in the financial

information, because there was a strong public interest in enabling "the public [to] more easily

determine whether USDA is" monitoring noncompliance); *News-Press*, 489 F.3d at 1196, 1205

(ordering disclosure of street addresses of recipients of FEMA aid because there was "a powerful

public interest" in determining where FEMA distributed "billions of taxpayer dollars" that

outweighed any privacy interest, but no disclosure of recipients' names because "the names

[were] not necessary to determine the extent of fraud against FEMA"); *W. Watersheds Project v.*

*Bureau of Land Mgmt.*, CV 09-482-CWD, 2010 WL 3735710, at *10 (D. Idaho Sept. 13, 2010)

(finding that name, address, email, phone number, and other details about grazing permittee's

permit allotments constituted a "minimal," but "non-trivial privacy interest," which was

ultimately outweighed by the public interest in determining whether permits were properly

issued); *Columbia Riverkeeper*, 650 F. Supp. 2d at 1130 (holding that the public interest in

disclosing mailing list of names and addresses of people on path of proposed pipeline

outweighed any privacy interest in the information because disclosure would help public to

oversee whether agency was complying with public notice mandate).  By contrast, where courts

have found no public interest in the release of the information whatsoever, Exemption 6 has been

applied to withhold names and addresses associated with financial information.  *See Consumers'*

*Checkbook Ctr. for the Study of Servs.*, 554 F.3d at 1051 (finding a strong privacy interest "in the

total payments [physicians] receive from Medicare for covered services" that prevented

disclosure only because revealing the physicians' names did "not serve *any* FOIA-related public interest") (emphasis added).

Some of the challenged emails here also reveal the views of private citizens. In analogous circumstances, courts have required the disclosure of names and addresses in connection with a private citizen's statements or views when the private citizen voluntarily relayed this information to the government and the requester identified a public interest. *See Elec. Frontier Found. v. Office of the Dir. of Nat'l Intelligence*, 639 F.3d 876, 887 (9th Cir. 2010) (holding that Exemption 6 did not cover names of corporate lobbyists petitioning the government on behalf of corporate clients because there "is a clear public interest in the public knowledge of the methods through which well-connected corporate lobbyists wield their influence"); *People for the Am. Way Found.*, 503 F. Supp. 2d at 305–06 (finding that agency improperly withheld under Exemption 6 names and addresses, phone numbers, and email addresses of citizens "who submitted unsolicited email comments . . . concerning the proposed change of the video display at the Lincoln Memorial" because there is little privacy interest in contact information when someone petitions the government and "the public interest in knowing who" convinced the agency "to change the video outweighs any privacy interest in one's name"); *Alliance for Wild Rockies v. U.S. Dep't of Interior*, 53 F. Supp. 2d 32, 37 (D.D.C. 1999) (holding that Exemption 6 did not cover withholding of names and addresses of rulemaking commenters because there was little privacy interest since information was voluntarily submitted and the "public has much to learn about defendants' rulemaking process" including whose comments "the defendants give greater weight" to).[4]

---

[4] Consistent with CBP's observation that disclosure is not warranted when no public interest in the information is identified, courts have applied Exemption 6 to protect names and addresses associated with a citizen's views where they have found no public interest in the disclosure. *See, e.g.*, *Gov't Accountability Project v. U.S. Dep't of State*, 699 F. Supp. 2d 97, 106 (D.D.C. 2010) (finding that names and emails were properly withheld under Exemption 6

The outcome of the D.C. Circuit cases the parties rely on only provides further support that disclosure here is appropriate. Both parties extensively discuss *Norton* and *Horner*, which reach opposite conclusions in their consideration of the balancing of the privacy and public interests at stake with the disclosure of names and addresses. *See* Def.'s Reply at 5–7, Pl.'s Reply at 2–3; *see also Horner*, 879 F.2d at 874–77; *Norton*, 309 F.3d at 30. In *Norton*, the U.S. Fish and Wildlife Service withheld the addresses of private landowners who had voluntarily reported pygmy owl sightings due to a fear that "lawless birdwatchers" would trespass on the landowners' properties. *Norton*, 309 F.3d at 30, 34. Although the requester only sought the addresses of the landowners, *id.* at 30, the D.C. Circuit still found a substantial privacy interest in the information because knowledge of an individual address was "only a step from being able to identify from state records the name of the individual property owner," *id.* at 35. Nevertheless, the Court held that this privacy interest was insufficient to overcome the significant public interest in reviewing the agency's use of the information to designate areas as a "critical habitat" under the Endangered Species Act. *Id.* at 36.

CBP responds by arguing that the facts at issue are closer to *Horner*, where the D.C. Circuit found that the Office of Personnel Management properly withheld a list of names and addresses of retired or disabled federal employees. *Horner*, 879 F.2d at 879–80. The Circuit recognized that there was a "modest personal privacy interest" that weighed against revealing the

---

where there was a "clear privacy interest" in avoiding disclosure of emails and such disclosure would serve no public purpose); *Voinche v. F.B.I.*, 940 F. Supp. 323, 330 (D.D.C. 1996) *aff'd*, No. 96-5304, 1997 WL 411685 (D.C. Cir. June 19, 1997) (finding that Exemption 6 protects from disclosure names of "private citizens who wrote to government officials" because there was "no reason to believe that the public will obtain a better understanding of the workings of various agencies by learning the[ir] identities"); *Prudential Locations LLC v. U.S. Dep't of Hous. & Urban Dev.*, 739 F.3d 424, 426, 434 (9th Cir. 2013) (per curiam) (finding that agency properly withheld names of people who reported illegal activity because the privacy interest was great and the plaintiff presented no evidence that disclosure of the names would shed light on agency's investigations or activities); *Lakin Law Firm, P.C. v. FTC*, 352 F.3d 1122, 1125 (7th Cir. 2003) (holding that names of people who complained to agency of billing scams were properly withheld under Exemption 6 even though they submitted complaints via website that warned that comments could be publicly disclosed because the information would reveal nothing about agency workings and there was no public interest).

names only because there was "*no* public interest" in disclosure where the only stated public benefit was "inform[ing] the public . . . where its money is going." *Id*. at 879 (emphasis added). The Circuit found that this public interest is insufficient because it "say[s] nothing of significance" about the inner workings of the government. *Id*.

*Horner* and *Norton* are consistent with the cases discussed above. While there was no public benefit found in *Horner*, the *Norton* court identified a strong public interest, which warranted the intrusion into the privacy interest identified and compelled the Circuit to order disclosure. The sum of these cases establish that where the requester has articulated a legitimate public interest in the information, courts have ordered disclosure of names and addresses, even if such information is associated with financial information, views held by the landowner, or would risk unwanted contact.

Similarly here, as noted, the public interest in learning how CBP negotiated with private citizens regarding the planning and construction of the border wall is significant. This public interest outweighs the privacy interest in landowners' names and addresses in CBP emails. Accordingly, for the reasons set forth above, the Court holds that the public interest in disclosing the names and addresses of landowners outweighs the implicated privacy interest and CBP's withholding of the information under Exemption 6 is improper.

## B. FOIA Exemption 7(E)

CBP has withheld under exemption 7(E) information relating to its assessment of the need for fencing. Exemption 7(E) covers "records or information compiled for law enforcement purposes" that "would disclose techniques and procedures for law enforcement investigations or prosecutions, or would disclose guidelines for law enforcement investigations or prosecutions if such disclosure could reasonably be expected to risk circumvention of the law." 5 U.S.C. §

552(b)(7)(E). The "requirement that disclosure risk circumvention of the law 'sets a relatively low bar for the agency to justify withholding.'" *See Pub. Employees for Envtl. Responsibility v. U.S. Section, Int'l Boundary & Water Comm'n, U.S.-Mexico*, 740 F.3d 195, 204–05 (D.C. Cir. 2014) (quoting *Blackwell v. FBI,* 646 F.3d 37, 42 (D.C. Cir. 2011)). The agency "must demonstrate only that release of a document might increase the risk 'that a law will be violated or that past violators will escape legal consequences.'" *Id.* at 205 (quoting *Mayer Brown LLP v. IRS* ("*Mayer Brown*")*,* 562 F.3d 1190, 1193 (D.C. Cir. 2009)). "Rather than requiring a highly specific burden of showing how the law will be circumvented, exemption 7(E) only requires that the [agency] demonstrate logically how the release of the requested information might create a risk of circumvention of the law." *Blackwell*, 646 F.3d at 42 (quoting *Mayer Brown*, 562 F.3d at 1194 (internal quotation marks and alterations omitted)).

The plaintiff challenges the CBP's withholdings under exemption 7(E) on three grounds. First, the plaintiff argues that the records are not "compiled for law enforcement purposes," 5 U.S.C. §552(b)(7), because they do not relate to an enforcement proceeding. Pl.'s Mem. at 20. The Court disagrees. As the D.C. Circuit recently pointed out, "Law enforcement entails more than just investigating and prosecuting individuals *after* a violation of the law . . . the ordinary understanding of law enforcement includes . . . proactive steps designed to prevent criminal activity and to maintain security.'" *See Pub. Empls. for Envtl. Responsibility*, 740 F.3d at 203 (citing *Milner,* 131 S.Ct. at 1272 (Alito, J., concurring)). This Circuit has long employed a two-part test, first set forth in *Pratt v. Webster*, 673 F.2d 408 (D.C. Cir. 1982), to determine whether records are law enforcement records. *Id.* A record is used for law enforcement where: "the investigatory activity that gave rise to the documents is 'related to the enforcement of federal laws,' and there is a rational nexus between the investigation at issue and the agency's law

enforcement duties." *Tax Analysts v. IRS*, 294 F.3d 71, 78 (D.C. Cir. 2002) (citing *Pratt*, 673 F.2d at 420–21). Moreover, courts are "more deferential to the agency's claimed purpose for the particular records" where "the agency's principal function is law enforcement." *Pub-Employees for Envtl. Responsibility*, 740 F.3d at 203 (quoting *Tax Analysts*, 294 F.3d at 77).

Here, CBP is indisputably a law enforcement agency and is entitled to deference in its determination that the records were compiled for a law enforcement purpose. CBP contends that the challenged redactions relate to its "risk and vulnerabilities assessment of illicit cross-border activity in order to assess fencing needs," which includes information such as "terrain, floodplain, waterways . . . migration patterns," as well as "areas that are difficult for Border Patrol to access" and "areas patrolled by fewer agents, and urban areas where illegal traffic has a greater chance of blending in quickly without being apprehended." Wade Decl. ¶ 15. This information "inform[s CBP's] decisions relating to fence placement." Suppl. Wade Decl. ¶ 18. Furthermore, some emails "contain references to specific Border Patrol Station 'border zones,'" which are designations used internally for assignment coverage, and knowledge of these border zones could be used to parse law enforcement radio discussions referencing them. Wade Decl. ¶ 15. CBP contends that "release of this information would essentially provide a 'roadmap' to those attempting to cross the border." Wade Decl. ¶ 15.

CBP's declarations sufficiently demonstrate that the redacted information is related to the enforcement of federal laws, as the assessment of border vulnerabilities is directly related to the potential violation of federal immigration laws and the CBP's duty to deter illegal immigration and to apprehend illegal immigrants. *See Tax Analysts*, 294 F.3d at 78. Thus, the CBP has demonstrated that the records were created for a law enforcement purpose.

Second, the plaintiff asserts that Exemption 7(E) does not apply because the CBP has not shown that the challenged emails qualify as "techniques, procedures, or guidelines." Pl.'s Mem. at 19 (citing Wade Decl. ¶ 15). According to the plaintiff, the challenged emails "contain 'assessments of the operational need for fencing,' not information relating to investigations or prosecutions." *Id.* The plaintiff's interpretation of the statutory language is overly restrictive. The D.C. Circuit has held that "an agency may seek to block the disclosure of internal agency materials relating to guidelines, techniques, sources, and procedures for law enforcement investigations and prosecutions, even when the materials have not been compiled in the course of a specific investigation." *Tax Analysts*, 294 F.3d at 79. Even if withheld documents "are not 'how-to' manuals for law-breakers, the exemption is broader than that." *See Mayer Brown*, 562 F.3d at 1192–93. "Information that relates to law enforcement techniques, policies, and procedures is properly withheld under this exemption." *Showing Animals Respect & Kindness v. U.S. Dep't of Interior*, 730 F. Supp. 2d 180, 199 (D.D.C. 2010) (citing *Boyd v. Bureau of Alcohol, Tobacco, Firearms, and Explosives,* 570 F. Supp. 2d 156, 158 (D.D.C. 2008)).

In *Mayer Brown*, the D.C. Circuit held that records relating to "settlement strategies and objectives, assessments of litigating hazards, [and] acceptable ranges of percentages for settlement" were exempt under 7(E) because, although not a "blueprint for tax shelter schemes, it could encourage decisions to violate the law or evade punishment." *Mayer Brown*, 562 F.3d at 1192–93 (citing *Mayer Brown LLP v. IRS,* No. 04–2187, slip op. at 3 (D.D.C. Nov. 28, 2006)). Here, although the information in the challenged records are not styled as formal guidelines or procedures for CBP officials, the records refer to information, including how CBP officials assess vulnerable areas along the border, that could be used to "encourage decisions to violate the law or evade punishment." *Id*. at 1193; *see also Showing Animals Respect & Kindness*, 730

F. Supp. 2d at 199–200 (finding that files revealing "specific details of surveillance techniques, including equipment used and location and timing of use," was exempt under 7(E) because it "could compromise [the agency's] ability to conduct future investigations"); *Strunk v. U.S. Dep't of State*, 905 F. Supp. 2d 142, 148 (D.D.C. 2012) (concluding that release of computer screen transaction codes, computer transaction codes and computer function codes, although "not themselves techniques and procedures for law enforcement investigations or prosecutions" are exempt under 7(E) because it "could reasonably be expected to risk circumvention of the law" (internal quotation marks omitted)). Accordingly, while the emails in question do not reveal formal guidelines, CBP has demonstrated that the information contained in the emails could be used in the same manner as a "technique, procedure, or guideline."

Finally, the plaintiff claims that CBP has not "logically shown that release of the records could be reasonably expected to risk circumvention of the law." Pl.'s Mem. at 19.[5] In the plaintiff's view, details "such as terrain and geographic location are identifiable by sight," and therefore the challenged records will not add to criminals' knowledge of the conditions along the border wall. *Id.* at 19–20. The plaintiff argues further that since "Border Patrol operations may have changed" since the emails were drafted, Pl.'s Mem. at 20, the information no longer "provide[s] a roadmap of where it would *currently* be best to cross the border," and, thus, does not risk circumvention of the law. Pl.'s Reply at 11. The Court disagrees.

---

[5] "[C]ourts have disagreed over whether" the qualifying clause requiring that disclosure "reasonably be expected to risk circumvention of the law," 5 U.S.C. § 552(b)(7)(E), applies to "techniques and procedures for law enforcement investigations or prosecutions." *Pub. Empls. for Envtl. Responsibility*, 740 F.3d at 205 n.4. This Circuit has applied the qualifying clause to "techniques and procedures," *id.* (citing *Blackwell*, 646 F.3d at 41–42), but "given the low bar posed by the 'risk circumvention of the law' requirement, it is not clear that the difference matters much in practice." *Id.* CBP argues that the final clause does not apply to "techniques and procedures," and that the exemption thus "afford[s] 'categorical protection'" for techniques and procedures. *See* Def.'s Mem. at 20 (citing *Smith v. Bureau of Alcohol, Tobacco and Firearms*, 977 F. Supp. 496, 501 (D.D.C. 1997)). As discussed below, CBP has demonstrated through its declarations that disclosure "could reasonably be expected to risk circumvention of the law." Thus the exemption is applicable in any event and the Court need not decide the scope of the qualifying clause of Exemption 7(E).

Although some geological factors may be readily identifiable by sight or through publicly available information, CBP has also attested that the emails reveal "areas that are difficult for Border Patrol to access" and "areas patrolled by fewer agents." Wade Decl. ¶ 15. Such information discloses the CBP's operations and vulnerabilities, which are not readily-accessible public information, the disclosure of which could risk appropriation to circumvent the law. *See Showing Animals Respect & Kindness*, 730 F. Supp. 2d at 200 (finding that documents detailing surveillance techniques logically risked circumvention of the law because, "although trespassers and poachers . . . likely know that they are subject to surveillance, the details of the surveillance techniques are unknown to them"); *Blanton v. U.S. Dep't of Justice*, 63 F. Supp. 2d 35, 49–50 (D.D.C. 1999) (holding that Exemption 7(E) applies to documents revealing FBI polygraph techniques because although general information on the polygraph test is "often depicted and discussed," the "specific methods employed by the FBI" are not generally known). Moreover, the discussion of publicly available information, itself, reveals what information CBP considers when analyzing its vulnerabilities at the border, and this analysis, itself, is not publicly known and may risk circumvention of the law. *See Blackwell*, 646 F.3d at 42 (manner in which FBI data is "searched, organized, and reported to the FBI is an internal technique, not known to the public" therefore is subject to exemption 7(E)). Although the plaintiff claims that vulnerabilities at the border may have changed since the emails were drafted, making this information ineffectual, the plaintiff has put forth no evidence to prove that the information is no longer current and lacks all value to would-be violators. *See* Pl.'s Mem. at 20; Pl.'s Reply at 11. Here, CBP has submitted two declarations declaring that release of this information would aid those attempting to cross the border as well as "smugglers and criminal elements" in their determination of CBP's vulnerabilities along the border. *See* Wade Decl. ¶ 15; Suppl. Wade

Decl. ¶ 18. In FOIA cases, agency declarations are viewed with "a presumption of good faith," *Ground Saucer Watch v. CIA*, 692 F.2d 770, 771 (D.C. Cir. 1981), and since the plaintiff has presented no counter-evidence and no evidence of the agency's bad faith in its declarations, the Court finds that CBP has shown that the challenged withholding under Exemption 7(E) would risk circumvention of the law. *Id.*

The plaintiff has failed to present sufficient evidence contradicting the CBP's contention that the redacted information falls under Exemption 7(E) as techniques or procedures that are reasonably shown to risk circumvention of the law. Accordingly, the Court finds that CBP has shown that the challenged withholdings detailing the operational need to determine fencing are appropriately withheld under FOIA exemption 7(E).

### C. Email Attachments

The plaintiff and CBP dispute whether CBP is improperly withholding the attachments to responsive emails pursuant to the parties' agreement to limit the scope of CBP's production of emails. The crux of the parties' dispute is the interpretation of the language of their joint status report, which embodies the parties' agreement on the scope of the agency's obligations in fulfilling the plaintiff's FOIA request. *See generally* 7/23/09 JSR. As described below, the plain meaning of the parties' joint status report and the language of this Court's order ratifying the parties' agreement make it apparent that CBP was only obliged to produce to the plaintiff the same records that CBP produced in the *CREW* litigation.

The parties fundamentally disagree over the terms of the agreement governing the CBP's production of records to the plaintiff. The parties submitted a joint status report to the Court advising that:

> [I]n the interest of expediting the release of emails to Plaintiff, CBP may satisfy Plaintiff's FOIA request with respect to the processing of emails by providing to

> Plaintiff the emails *as released* in *CREW v. DHS* pursuant to the search described in the Joint Status Report and Proposed Disclosure Schedule . . . in that case as follows: (1) by providing Plaintiff, within 30 days of the entry of the accompanying order, all emails already released in *CREW v. DHS* and (2) going forward, by providing Plaintiff further emails as they are released on a rolling basis in that case.

7/23/09 JSR at 3 (emphasis added). The Court entered a Scheduling Order effectuating this agreement based on the proposed order submitted by the parties with their joint status report. *See* Proposed Order ¶ 2, ECF No. 6-1; 7/27/09 Sched. Order ¶ 2; Def.'s Reply at 21 n.6. The Order required CBP to, *inter alia*, "release to Plaintiff all email records already released in [*CREW*], and, going forward, CBP will release to Plaintiff on a rolling basis all email records released in *CREW v. DHS*, on the same schedule as they are released in that case." *See* 7/27/09 Sched. Order ¶ 2.

Both parties construe the phrase "as released" in the joint status report to impose different requirements on CBP with respect to the production of records. CBP contends that this wording limits the scope of the plaintiff's FOIA request and reflects the parties' agreement that CBP would only produce to the plaintiff the documents that were "actually released in *CREW* and nothing else" and that "any email related records not released in *CREW* because the parties in *CREW* did not consider them to be responsive were . . . not responsive to Plaintiff's FOIA request." *See* Def.'s Reply at 23. Thus, CBP contends that it satisfied its FOIA obligation to the plaintiff by "undertak[ing] the administrative act of forwarding emails released in *CREW* to Plaintiff." Def.'s Reply at 21.

The plaintiff responds that CBP's agreement to produce documents "as released" in CREW refers merely to the timing of the release of the records. Pl.'s Mem. at 22. The plaintiff asserts that under the agreement, CBP agreed to release the documents to the plaintiff according to the scheduled release of documents in *CREW*. *Id.* The plaintiff further explains that the

language of the joint status report stating that CBP would release records "pursuant to the search described" in *CREW*, indicates that the parties agreed to limit the "scope of the *search* for records" only, and not the scope of the documents that CBP was obliged to produce. *Id.* at 21 (emphasis added). The plaintiff reasons that the agreement relieved CBP of "retrieving and processing *additional* records," but did not permit CBP to withhold portions of records that were deemed responsive, even if these portions of records were not released to the plaintiff in *CREW*. Pl.'s Reply at 12 (emphasis in original). Consequently, the plaintiff claims that CBP is improperly withholding the attachments to the responsive emails because the attachments are a "portion of the records." Pl.'s Mem. at 21.

The plain meaning of the joint status report makes clear that the plaintiff narrowed her FOIA request to require CBP to produce only emails that the CBP actually produced to the *CREW* plaintiff "on a rolling basis in that case." 7/23/09 JSR at 3. The phrase "as released" plainly refers to the records actually released to the plaintiff in *CREW*, rather than the timing of the releases, as the plaintiff contends. Thus, CBP is correct that it "may satisfy Plaintiff's FOIA request" by providing the plaintiff the same emails that the CBP produced in *CREW*. The attachments, therefore, are not being withheld, but, as memorialized by the parties' joint status report, are not responsive to the plaintiff's amended FOIA request.

Even if the joint status report were ambiguous on this point, the Court's subsequent Scheduling Order based on the parties' proposed order supports CBP's interpretation of the joint status report. *See Act Now to Stop War & End Racism Coal. v. D.C.*, 286 F.R.D. 117, 129 (D.D.C. 2012) (explaining that scheduling orders "should be read as being specific and comprehensive" and that "[w]hen an Order details the scope of permissible discovery, a party should not read into the gaps permission to propound whatever discovery it so wishes"). The

Order states that CBP "will release to Plaintiff on a rolling basis all email records released in *CREW*, on the same schedule as they are released in that case." 7/27/09 Sched. Order ¶ 2. The Order clarifies CBP's two separate obligations: the first phrase requires CBP to release to the plaintiff the same records "released" in *CREW*, while the latter phrase requires that CBP release the responsive email records to the plaintiff at the same time that the records are released to the plaintiff in *CREW*. *See* Pl.'s Mem. at 21–25; Def.'s Mem. 4–9. The plain meaning of both the parties' joint status report and this Court's subsequent Order are clear that CBP had to release to the plaintiff the same records released in *CREW* at the same time that they were released in *CREW*. The plaintiff's *post hoc* effort to re-write the agreement with CBP as limiting her FOIA request only to the same search conducted but not the same production as in *CREW* is simply not sustainable. The agreement limited both CBP's search and production obligation to the agency's efforts in *CREW*. Thus, contrary to the plaintiff's contention, the responsive documents to which the plaintiff is entitled are defined both by the search conducted by CBP, and also by the documents actually produced in *CREW*. Since the email attachments were not actually produced in *CREW* because they were deemed nonresponsive, they correspondingly need not be produced to the plaintiff.[6]

The plaintiff argues that the Order ratifies her interpretation of the language of the joint status report because it omits the phrase "as released" from the Order. Pl.'s Mem. at 22; *see* 7/27/09 Sched. Order ¶ 2 (requiring that "going forward, CBP will release to Plaintiff on a rolling basis all email records released in *CREW v. DHS*"). The omission of this phrase in the

---

[6] CBP further argues that the challenged email attachments are not required to be disclosed, first, because the plaintiff did not challenge the withholding of the email attachments while CBP was making its rolling productions, Def.'s Mem. at 8 ("It was not until late May 2011—nearly 21 months after the first release of email records—that Plaintiff first raised any issue regarding the lack of attachments to the emails released in *CREW*"), and, second, because producing the attachments would frustrate the parties' purpose of expediting disclosure, *id.* at 8–9. Since the Court finds in CBP's favor, the Court need not address these arguments.

Order does not support the plaintiff's interpretation. Indeed, the language of the Order lends stronger support to CBP's claim because the Order states, in two separate clauses, that (1) CBP must "release to Plaintiff all email records already released in [*CREW*]" and that they must continue to release to the plaintiff "on a rolling basis all email records released in" *CREW*, and (2) this production must occur "on the same schedule as they are released in that case." 7/27/09 Sched. Order ¶ 2. *See also* Def.'s Reply at 21 n.6. The schedule on which CBP was required to release records to the plaintiff is set out in the second clause and was thus a separate requirement from the scope of the responsive records set out in the first clause. The plaintiff's interpretation conflates both clauses to refer to the timing of the releases, but this is inconsistent with the canon of statutory interpretation against surplusage. Courts have used canons of statutory interpretation to clarify court orders. *See Act Now to Stop War & End Racism Coal.*, 286 F.R.D. at 129 (interpreting court's standing order); *see also Bhd. of Locomotive Eng'rs & Trainmen v. Burlington N. Santa Fe Ry. Co.*, 925 F. Supp. 2d 1252, 1256 (D. Wyo. 2013), *aff'd sub nom.*, *Bhd. of Locomotive Eng'rs & Trainmen v. BNSF Ry. Co.*, 13-8025, 2013 WL 6404962 (10th Cir. Dec. 9, 2013) (interpreting order of a railroad adjustment board). Accordingly, applying the canon against surplusage to the Court's order dictates an interpretation that none of the phrases are "inoperative or superfluous, void or insignificant." *See Corley v. United States*, 129 S.Ct. 1558, 1566 (2009) ("[O]ne of the most basic interpretive canons [is] that '[a] statute should be construed so that effect is given to all its provisions'" (quoting *Hibbs v. Winn,* 542 U.S. 88, 101, 124 (2004))); *Jones v. United States*, 529 U.S. 848, 849 (2000) ("Judges should hesitate to treat statutory terms in any setting as surplusage" (citing *Ratzlaf v. United States,* 510 U.S. 135, 140–41 (1994))). In short, the inclusion in the Order of the second clause requiring CBP to release the emails "on the same schedule as they are released in that case," is the relevant phrase to

control the timing of disclosure, while the scope of the responsive records is defined by the records released in *CREW*. 7/27/09 Sched. Order.

Although CBP's interpretation of the parties' agreement is correct, this is a classic Pyrrhic victory. The plaintiff may simply file a new FOIA request seeking these same email attachments. *See Spannaus v. U.S. Dep't of Justice*, 824 F.2d 52, 61 (D.C. Cir. 1987) (discussing a plaintiff's ability to resurrect a FOIA claim for statute of limitations purposes because a requester could simply "refile his FOIA request tomorrow and restart the process" because "nothing prevents him from requesting the same withheld documents decade after decade") (cited in *Aftergood v. CIA*, 225 F. Supp. 2d 27, 30–31 (D.D.C. 2002)). Nevertheless, for the purposes of the plaintiff's present FOIA request, as narrowed pursuant to the parties' joint status report and this Court's Order, this Court holds that CBP is not required to produce the email attachments of responsive records to the plaintiff.

### D.     Segregability

The FOIA requires that "[a]ny reasonably segregable portion of a record shall be provided to any person requesting such record after deletion of the portions which are exempt." 5 U.S.C. § 552(b). The plaintiff has not challenged CBP's failure to release all reasonably segregable information to the plaintiff pursuant to its obligation to do so under the FOIA. *See id.* Nevertheless, even when a plaintiff does not challenge the segregability efforts of an agency, the Court has "an affirmative duty to consider the segregability issue *sua sponte.*" *Trans-Pac. Policing Agreement v. U.S. Customs Serv.*, 177 F.3d 1022, 1028 (D.C. Cir. 1999); *see also Juarez v. U.S. Dep't of Justice*, 518 F.3d 54, 60 (D.C. Cir. 2008) ("Under this Circuit's law, the district court's failure to address segregability in its memorandum opinion is reversible error."). The D.C. Circuit has acknowledged that establishing the non-segregability of non-exempt

material "presents problems for the agency since ... segregability depends entirely on what information is in a document and how it is presented." *Mead Data Inc. v. U.S. Dep't of the Air Force,* 566 F.2d 242, 261 (D.C. Cir. 1977). Therefore, although "agencies should not be forced to provide such a detailed justification that would itself compromise the secret nature of potentially exempt information," agencies "must be required to provide the reasons behind their conclusions in order that they may be challenged by FOIA plaintiffs and reviewed by the courts." *Id.*

To this end, the Circuit has said that "[i]n addition to a statement of its reasons, an agency should also describe what proportion of the information in a document is non-exempt and how that material is dispersed throughout the document." *Id.* Under *Mead Data,* if a small proportion of the information is non-exempt, the agency's explanatory burden is less, and if a larger proportion of the information is non-exempt, "the courts should require a high standard of proof for an agency claim that the burden of separation justifies nondisclosure or that disclosure of the non-exempt material would indirectly reveal the exempt information." *Id.* Since *Mead Data*, the Circuit has relaxed this standard, holding that "[a]gencies are entitled to a presumption that they complied with the obligation to disclose reasonably segregable material," which must be overcome by some "quantum of evidence" by the requester. *Sussman v. U.S. Marshals Serv.,* 494 F.3d 1106, 1117 (D.C. Cir. 2007). Indeed, more recent decisions from the D.C. Circuit have held that an agency may satisfy its segregability obligations by (1) providing a *Vaughn* index that adequately describes each withheld document and the exemption under which it was withheld; and (2) submitting a declaration attesting that the agency released all segregable material. *See, e.g., Loving v. U.S. Dep't of Def.*, 550 F.3d 32, 41 (D.C. Cir. 2008) (stating that "the description of the document set forth in the *Vaughn* index and the agency's declaration that it released all

segregable material" are "sufficient for [the segregability] determination"); *Johnson v. Exec. Office for U.S. Att'ys,* 310 F.3d 771, 776 (D.C. Cir. 2002) (upholding agency's segregation efforts based on "comprehensive *Vaughn* index" and "the affidavits of" agency officials).

In the instant case, CBP has provided the plaintiff with a *Vaughn* index of the 289 challenged records listing the justification for withholding information. *See* Wade Decl. at 15. CBP has also submitted two declarations by David E. Wade, the Operations Officer with the Office of Border Patrol within the Department of Homeland Security, which attest that CBP "has processed and released all reasonably segregable information within the disputed email documents" after "carefully evaluat[ing] each email document." Wade Decl. ¶ 16. Moreover, CBP reviewed the challenged records for segregability throughout the course of the litigation, releasing to the plaintiff new copies of challenged records with fewer redactions when the CBP filed its summary judgment motion, Gilman Decl. ¶ 12, and after the plaintiff filed her cross-motion for summary judgment. Suppl. Wade Decl. ¶¶ 12–13. In sum, there is ample evidence that CBP fulfilled its segregability obligation, which the plaintiff does not challenge in her briefs. Accordingly, the Court finds that CBP has satisfied its burden of demonstrating that the challenged records were examined and portions of the records were withheld only after considering whether CBP could disclose any "reasonably segregable portion[s]" of the records pursuant to its obligation under 5 U.S.C. § 552(b).

## IV.    CONCLUSION

For the foregoing reasons, CBP's Motion for Summary Judgment, ECF No. 32, is GRANTED in part and DENIED in part and the plaintiff's Motion for Summary Judgment, ECF No. 35, is GRANTED in part and DENIED in part. CBP's motion for summary judgment is granted, as conceded, with respect to the redaction of emails under Exemption 5, the redaction of

Record 24 in the *Vaughn* index under Exemption 7(E), the redaction of phone numbers or email addresses of landowners, the redaction of names and contact information of CBP employees or of individual employees of contractors, and the withholding of attachments to emails other than the 289 emails challenged in this suit.  CBP is further entitled to summary judgment on its withholding of information under FOIA Exemption 7(E) and the non-production of email attachments for the 289 challenged emails.  The plaintiff is entitled to summary judgment on CBP's withholding of information under FOIA Exemption 6.  CBP shall release, by May 15, 2014, to the plaintiff portions of the challenged email records that were previously withheld under Exemption 6.

Date: March 14, 2014

_____
BERYL A. HOWELL
United States District Judge